**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANA LYNETTE GREGORY ELDRIDGE,** individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>**BEECH-NUT NUTRITION COMPANY, GERBER PRODUCTS CO.,** and **JOHN DOE MANUFACTURERS,**<br><br>    Defendants. | No.  1:21-cv-283 (TJM/CFH)<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Ana Lynette Gregory Eldridge ("Lynette Gregory"), individually and on behalf of all others similarly situated, by and through her attorneys, Fegan Scott LLC, alleges the following based on personal knowledge of the facts pertaining to her, and upon information and belief and the investigation of her counsel as to all other matters.

## I.  INTRODUCTION

1.    Parents place a tremendous amount of trust in baby food companies, relying on them to provide safe, nutritious products for their developing, vulnerable infants and toddlers.

2.    Indeed, little could be more important than the nutrition parents offer their children in their earliest years.  Eighty percent of brain development occurs before age three.[1]

3.    Beech-Nut Nutrition Company ("Beech-Nut") and Gerber Products Co.

---

[1] https://childinst.org/brain-development-series-part-i/.

("Gerber"), however, abused parents' trust, selling baby food products that contained harmful and dangerous contaminants like arsenic and lead, all while marketing their products as safe and rigorously tested.

4.      On February 4, 2021, United States Representative Raja Krishnamoorthi, Chairman of the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy (the "Subcommittee"), "released a staff report showing that **baby foods are tainted with dangerous levels of toxic heavy metals that endanger infant neurological development and long-term brain function**" (the "House Report").[2]

5.      In connection with the House Report, Subcommittee Chairman Krishnamoorthi issued the following statement:

> Baby food manufacturers hold a special position of public trust.  But consumers mistakenly believe that these companies would not sell unsafe products.  **The Subcommittee's staff report found that these manufacturers knowingly sell baby food containing high levels of toxic heavy metals.**  I hope companies will commit to making safer baby foods.  Regardless, it's time that we develop much better standards for the sake of future generations.

(Emphasis added).

6.      The press release accompanying the House Report further stated that the investigation found:

- Top baby foods are tainted with dangerous levels of inorganic arsenic, lead, cadmium, and mercury.

- Industry self-regulation fails to protect consumers as manufacturers set their own dangerously high internal standards for toxic heavy metal levels.

---

[2] https://oversight.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-top-baby-foods-contain-dangerous (Emphasis added).

- Manufacturers routinely ignore internal standards and continue to sell products with higher heavy metal levels.

- Manufacturers' prevalent practice of only testing their ingredients is concealing higher levels of toxic metal in finished baby foods.

7. Subcommittee Chairman Krishnamoorthi stated: "The Subcommittee's investigation revealed that manufacturers knowingly sell tainted baby food to unsuspecting parents, in spite of internal company test results showing high levels of toxic heavy metal, and without any warning labels whatsoever[.]"

8. According to the House Report, one of the offending baby food companies was Beech-Nut, a company that touts its "natural" and "organic" products and markets itself as having "real food for real babies."[3]

9. On its website, Beech-Nut claims its "purpose" is to "champion real food for a healthier world."[4]

10. Beech-Nut's website went so far as to claim it conducted rigorous testing for the very contaminants that the Subcommittee discovered were prevalent in Beech-Nut's products:

## what's inside your baby food matters

We're proud to offer natural and organic products that are free from artificial preservatives, colors and flavors. In fact, we conduct over 20 rigorous tests on our purees, testing for up to 255 pesticides and heavy metals (like lead, cadmium, arsenic

---

[3] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

[4] https://www.beechnut.com/our-story/.

and other nasty stuff). Just like you would, we send the produce back if it's not good enough.

11. Although Beech-Nut claims to have "food quality standards you can trust," the House Report revealed that its products actually contain unsafe levels of arsenic, lead, and cadmium and that the company fails entirely to test for mercury; and that the company fails to test its final products, instead testing only some of their ingredients.

12. Another of the offending companies, according to the House Report, is Gerber—a company that touts its "highest quality ingredients"; access to "the largest food research and development network of any food company"; its "higher standards" that are "among the strictest in the world"; and providing "nothing but the best for baby."

13. Gerber also claims to have a trademarked "clean field farming" program—with protection against unsafe metals and contaminates in mind—to ensure its fruits and vegetable purees are "wholesome and safe for every tiny tummy."

14. But the House Report revealed that Gerber's products actually contain unsafe levels of arsenic, lead, and cadmium; that the company "barely" tests for mercury; and that the company fails entirely to test its final products, instead testing only some of their ingredients.

15. Defendants provided parents with false assurances regarding the safety of their products for their vulnerable, developing infants.

16. Accordingly, Ms. Gregory brings this putative class action on behalf of herself, and all other purchasers and/or consumers of Gerber and/or Beech-Nut baby and toddler food products, seeking damages and injunctive relief for Beech-Nut's and Gerber's wrongful marketing of, sale of, and profit from dangerous baby food products.

## II.    PARTIES

17. **Plaintiff Lynette Gregory** is a resident of and citizen of Louisiana and the

United States. Ms. Gregory has purchased a variety of baby foods for her infant daughter, from retailers including Wal-Mart.

18.     Plaintiff believed the Beech-Nut and Gerber products she fed her baby were healthy, safe, and free of dangerous metals and contaminants.

19.     If Plaintiff had known Beech-Nut's and Gerber's products contained the contaminants revealed by the House Report, she would not have purchased them and/or would not have fed them to her baby.

20.     **Defendant Beech-Nut Nutrition Company ("Beech-Nut")** was founded in 1891 and manufactures more than 150 types of baby products, including a variety of purees and cereals.

21.     Beech-Nut is incorporated in New York. Its headquarters and principal place of business are in Amsterdam, New York in Montgomery County.

22.     The conduct alleged in this Complaint, including Beech-Nut's marketing, product development, product formulation, and sales occurred, were developed, and/or were initiated in New York.

23.     **Defendant Gerber Products Co. ("Gerber")** was founded in 1927. It is a Michigan corporation with its principal place of business in Virginia. Gerber sells its products throughout the country.

24.     **Defendants John Doe Manufacturer(s)** are other baby food companies whose products similarly contained harmful contaminants like lead, arsenic, mercury, and cadmium and who did not warn customers those contaminants were present and/or who reassured consumers that their products were safe.

### III.     JURISDICTION

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from Defendants.

26.     This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District.

27.     Venue is also proper because Defendant Beech-Nut is headquartered in this District.

## IV.     FACTS

### A. Beech-Nut and Gerber market themselves as safe, health-conscious baby food options.

28.     Beech-Nut sets itself apart from other baby food brands by touting the safety of its products.

29.     The company's website presents a history of providing "safe" products and even setting safety standards. For example, it states:

> Beech-Nut® has been around since 1891, making baby food since 1931. Located in upstate New York, we're a team of about 350 people passionate about making food for your – and our! – little ones. **Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority.** In fact, engineers from Beech-Nut® patented the vacuum-sealed jar that's now the safety standard in the industry.

(Emphasis added).

30.     Beech-Nut also claims to have "food quality standards you can trust" including a decades-long practice of "testing our ingredients for contaminants such as heavy metals and

pesticides." According to Beech-Nut, "we're aware of no higher standards in the industry than ours."[5]

31.    Beech-Nut's puree jars are stamped with claims like "real food for real babies," "100% natural," "naturals," and "organics," depending on the product.

32.    Beech-Nut's marketing focuses on its purportedly "simple," "real," products – containing only whole fruits and vegetables.

33.    One commercial says: "At Beech-Nut, homemade is our inspiration. Just real, whole fruits and vegetables go into our jars. And nothing else. This is not baby food. This is real food for babies."[6]

34.    In another commercial, the narrator says: "Moms deal with lots of labels. Some people say jarred baby food with nothing artificial is impossible. But we know, that with our cold puree cooking, it can be done. . . . Everyone can agree that real food with simple ingredients can never be wrong. Let's turn the labels around"; it then shows the actor turning around the baby food jar to reveal a label containing only apples and blackberries.[7]

35.    Gerber also claims to offer safe, healthy baby food products.

36.    Gerber advertises itself as providing "Nutrition for your little one at every age and every stage."[8]

37.    It claims to offer safe, high-quality ingredients:

**About Gerber**

At Gerber, we have the highest standards for everything we grow, and it's what we feed our own children**.** We know the best

---

[5] https://www.beechnut.com/food-quality-safety/.

[6] https://www.ispot.tv/ad/7pVS/beech-nut-natural.

[7] https://www.ispot.tv/ad/A9Om/beech-nut-turn-the-labels-around.

[8] https://www.gerber.com.

nutrition for baby starts with the highest quality ingredients.

38.     Gerber claims to have a robust food research network through its parent company,

Nestlé; the network is purportedly focused, in part, on food safety and quality[9]:

**Our Research**

With 24 research technology centers worldwide, Nestlé has the
largest food research and development network of any food
company. Nestlé's Worldwide Research & Development network
provides three fundamental areas of benefits for parents: safety and
quality; nutrition and health; and taste, texture, and convenience.

39.     Gerber continues these representations about health and safety on its product

labels and in its other marketing. On many of its purees, the largest word on the label is

"Natural" or "Organic."

40.     In one Gerber commercial,[10] for example, the narrator says:

This whole organic farm's for baby. New clean field farming made
for baby. It's higher standards set for baby. Heck no to GMOs for
baby. Nothing but the best for baby. The new Gerber.

41.     Gerber claims its trademarked "clean field farming" is "how we ensure our fruit

& veggie purees are not only nutritious, but also wholesome and safe for every tiny tummy."[11]

42.     Gerber's website claims it has "a team of agriculture experts that work hands-on

with the farmers who grow most of our crops."

43.     According to Gerber, it has an "obsession with tracking produce," and "know[s]

where every fruit & veggie is grown."

44.     In fact, Gerber claims[12] to have top standards to keep unsafe metals and

---

[9] https://www.gerber.com/about-us.

[10] https://youtu.be/nnCBoKFds_0.

[11] https://www.gerber.com/clean-field-farming.

[12] https://www.gerber.com/keeping-soil-in-the-family.

contaminates out of its baby food products:

> Some soil can have naturally high levels of nitrates and heavy metals, which you don't want in your baby's food. That's why we created requirements for growing our fruits and veggies that are among the strictest in the world.

45.    However, Gerber's and Beech-Nut's baby foods are not the safe, wholesome

products their advertising suggests.

**B. The health and safety of Gerber's and Beech-Nut's products have been called into question several times, yet the companies have reassured parents about their products' safety.**

46.    In June 2017, the Environmental Defense Fund issued a report finding that one in

five baby food samples contained lead.[13]

47.    Beech-Nut issued a response to "reassure parents that Beech-Nut's real foods for

babies are dependably safe, healthy, and nutritious."[14]

48.    That response continued, further reassuring consumers that Beech-Nut's products

are rigorously tested and meet strict quality standards:

> **Beech-Nut Response to the Environmental Defense Fund's Baby Food Report**
>
> We want to reassure parents that Beech-Nut's real foods for babies are dependably safe, healthy and nutritious.
>
> The products that were included in this report, all rice-based products, were tested in 2013 and have since been discontinued. Furthermore, in the five years since these products were tested, we have shifted our sourcing of rice to regions and suppliers that best meet our strict quality standards.
>
> At Beech-Nut, we test every delivery of fruits, vegetables, rice and other ingredients for up to 255 contaminants, including lead, to confirm that everything delivered to Beech-Nut complies with our

---

[13] https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf.

[14] https://www.beechnut.com/beech-nut-edf-response/.

standards.

No government standard or recommendation currently exists for lead. We would welcome the opportunity to work with the FDA and the USDA on science-based standards that food suppliers can implement across our industry.

**Frequently Asked Questions**

**What's your reaction to the FDA baby food testing data released by EDF?**

As the EDF mentions in its blog post, the FDA testing data released today is from 2013 and 2014. This is before Beech-Nut introduced a completely new line of products and revamped our sourcing standards. In fact, all the Beech-Nut products listed in the report have either been reformulated or discontinued.

We do believe an opportunity exists to develop government and industry standards and protocols where none exist. We worked with the FDA to develop the recent arsenic level draft guidance, which is a good example of how government, industry and others can work together to create safer and realistic standards that benefit consumers.

While no government standard currently exists for lead, we would welcome the opportunity to work with the FDA and the USDA on science-based standards.

**Is it true that Beech-Nut products contain lead, cadmium and arsenic?**

Even the highest quality, organic and non-GMO fruits and vegetables contain very tiny levels, or trace amounts, of lead and other elements because they commonly occur in the soil, water and air. The FDA states that: "Because lead may be present in environments where food crops are grown and animals used for food are raised, various foods may contain unavoidable but small amounts of lead that do not pose a significant risk to human health."

**Do you have a plan to reduce lead, cadmium and arsenic in your food?**

We've been testing our ingredients for heavy metals since 1985 and have continued to evolve our testing efforts to ensure our products are safe, healthy and nutritious. Once farmers send us their very best fruits and vegetables, we test for up to 255

pesticides and heavy metals including lead, cadmium and arsenic. Just like you would, we send the produce back if it's not good enough.

All our products meet or exceed the FDA draft guidance for inorganic arsenic in rice cereals. Our goal is to minimize the amount of heavy metals in our products through testing and partnering with our suppliers to identify the areas of the country and specific farms with the lowest levels possible.

One example of our rigorous standards is our approach to pesticide levels. The EPA, USDA and other government bodies have standards for limits on pesticides and organic certification, but our pesticide standards are ten times stricter than government requirements.

49.     Gerber, too, reassured parents[15]:

"We test our finished products, and results for over 2,000 samples of Gerber baby foods and juices show all our products fall well within available guidance levels," Gerber said in a statement released to the TODAY Show.

"This includes tests of more than 1,150 samples of Gerber juices, of which 100 percent were below the limit set by the Environmental Protection Agency for drinking water."

50.     In a statement to PBS, Gerber stated, in part: "We know parents may be concerned about a recent report on lead in foods and want to reassure them that Gerber foods and juices are safe."[16]

51.     In August 2018, a Consumer Reports analysis showed several baby food products—including Beech-Nut's and Gerber's baby foods—contained unsafe levels of toxic heavy metals.[17]

---

[15] https://www.today.com/health/there-lead-your-baby-food-t112735.

[16] https://www.pbs.org/newshour/nation/lead-detected-20-percent-baby-food-samples.

[17] https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

52. Again, Beech-Nut reassured its customers, stating[18]:

# Beech-Nut Response to the Recent Consumer Reports Article on Baby Food

We want to reassure parents that Beech-Nut's real food for babies is healthy, nutritious and safe. Our focus is on the safety and quality of the food we prepare for infants and toddlers.

The Consumer Reports baby food article recommends specific actions for manufacturers, including sourcing produce from areas less likely to be contaminated, and ensuring water and equipment used for manufacturing don't contribute to contamination. These actions have been an important part of Beech-Nut's quality and safety process for many years. We also want to assure parents that there is not a recall on any of our products, and we have high confidence in the quality and standards we use in making our food.

All produce – even the highest quality, organic and non-GMO fruits and vegetables you buy at the grocery store or a farmer's market – contain very tiny levels, or trace amounts, of lead and other elements because they exist naturally in soil, air and water. Our goal is and always has been to minimize the trace amounts of heavy metals in our products. Certain ingredients, like sweet potatoes and rice, are especially vulnerable because of their growing conditions.

Currently, no government standard or recommendation exists for lead. We continue to advocate for a government standard or recommendation for lead level, and we would welcome the opportunity to work with the FDA on science-based standards that food suppliers can implement across our industry.

Please visit our Food Quality & Safety page for more information on our food quality standards.

53. In October 2019, once again, the safety of Beech-Nut's and Gerber's products

---

[18] https://www.beechnut.com/response-recent-consumer-reports-article/.

was called into question. Healthy Babies Bright Futures, a children's health advocacy group, issued a report demonstrating that 95% of the baby foods it tested—including several of Beech-Nut's and Gerber's products—had detectable levels of dangerous heavy metals.[19]

54.     Yet again, Beech-Nut issued a statement telling parents not to worry because its products were safe and rigorously tested:

> Beech-Nut Nutrition has been making foods for babies since 1931. We take our responsibility and the trust families place in us seriously. Our products are dependably safe, healthy and nutritious.
>
> We apply rigorous testing protocols. Our process starts with high-quality fruits and vegetables that meet BNN's own standards, which in some cases are 10 times stricter than those of the U.S. government. For example, we test for 255 common contaminants, such as lead, other heavy metals and pesticides, to confirm that all the ingredients delivered to us and used in our products comply with our standards.  If they don't, we send them back.
>
> Because we care deeply about the quality of all food – not just baby food – in January 2019 Beech-Nut was a founding member of the Baby Food Council, which includes industry experts, advocacy groups and all major baby food companies. All of these parties share the common understanding that trace levels of heavy metals are commonly found in many foods because these elements are widely present in the environment. Beech-Nut Nutrition is committed to working together with our industry colleagues and other experts to develop methods to continue reducing the presence of these elements.
>
> "Being a dad, I understand the need for safe food. Beech-Nut cares deeply about the safety of all food – not just baby food – and that's why we were a founding member of the Baby Food Council. We're committed to working together to bring sustainable change in this important environmental issue," said Jason Jacobs, Vice President of Food Safety & Quality, Beech-Nut Nutrition.
>
> This news comes as Healthy Babies Bright Futures, a children's health advocacy group and member of the Council, released a new report demonstrating that tests on over 150 foods consumed by

---

[19] https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf.

babies and toddlers found that 95% of the products tested had detectable levels of heavy metals. Recognizing that heavy metals are widely present in the environment and can get into food, the Council seeks to reduce levels of heavy metals in food products to as low as reasonably achievable using best-in-class management techniques. Some of the recommendations in the report by Healthy Babies Bright Futures support what we've been doing at Beech-Nut for years, including being selective in sourcing and conducting rigorous testing.

55.     Gerber also reassured parents about its commitment to safety[20]:

"Gerber has always put babies and toddlers first, but we never stop asking ourselves, 'Can we do more?' This question inspires our commitment to continuously raise our high standards and improve our methods to reduce and limit contaminants in all our foods," said Joel Lim, M.D., Medical Director for Gerber. "We're excited to be partnering with like-minded organizations who are also committed to improving the safety and quality of food for little ones."

56.     Another news outlet reported[21] that Gerber reiterated its focus on testing, safety, and research:

Gerber regularly tests its ingredients, conducts random tests on finished products and works with suppliers to achieve high-quality food standards, according to the spokesperson.

"The health and safety of the children who eat our foods has always been our No. 1 priority – and always will be. We continue to refine our rigorous standards by evaluating the latest food safety guidance – from sources like the Food and Drug Administration, Environmental Protection Agency, the European Food Safety Authority and the World Health Organization," a statement says. "We also leverage our expertise in feeding babies and toddlers, using research from the Feeding Infants and Toddlers Study to inform our safety standards.

57.     In truth, despite their repeat reassurance to parents, both Beech-Nut and Gerber

---

[20] https://www.edf.org/media/baby-food-council-taking-challenge-reducing-heavy-metals-young-kids-food.

[21] https://www.fox17online.com/2019/10/17/gerber-says-safety-is-no-1-priority-after-baby-food-study/.

continue to sell baby food products that contain dangerous, toxic contaminates. Beech-Nut sells

products that contain contaminates at levels that exceed Beech-Nut's own internal safety

standards, which already allow some of the highest contaminant levels in the industry. And

neither company tests its final products for safety.

### C. The February 2021 House Report exposed Defendants' continued sale of dangerous and harmful baby food products.

58.     In February 2021, the House Report revealed that Defendants have continued to

sell baby food products with unsafe levels of arsenic, lead, and cadmium.

59.     The House Report noted the risks associated with these contaminants:

> Exposure to toxic heavy metals causes permanent decreases in IQ,
> diminished future economic productivity, and increased risk of
> future criminal and antisocial behavior in children. Toxic heavy
> metals endanger infant neurological development and long-term
> brain function.

60.     Despite the dangers these elements pose to developing children, Defendants

marketed and sold baby food with ingredients containing arsenic, lead, and cadmium.

61.     And Beech-Nut marketed and sold baby food (1) even after its own internal

testing revealed the presence of these contaminants, (2) even after its products exceeded its own

already-high internal safety thresholds, and (3) containing food additives that were, in particular,

alarmingly high in contaminants.

### D. Defendants' products contain lead.

62.     The House Report summarized the negative effects children can suffer if exposed

to each of the contaminants in the study, stating, with regard to lead, for example:

> Lead is number two on ATSDR's list of substances present in the
> environment that pose the most significant potential threat to
> human health. Even small doses of lead exposure are hazardous,
> particularly to children. Lead is associated with a range of bad
> health outcomes, including behavioral problems, decreased
> cognitive performance, delayed puberty, and reduced postnatal

growth. According to FDA, lead is especially dangerous to "infants" and "young children." FDA acknowledges that:

> High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.

> Lead exposure severely affects academic achievement in children. Even at low levels, early childhood lead exposure has a negative impact on school performance. Two separate studies of schoolchildren in Detroit and Chicago public schools found a strong inverse relationship between lead exposure and test scores. In the Detroit study, there was a "significant association" between early childhood lead exposure and decreased standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement. The Chicago study found that higher blood lead concentrations were associated with lower reading and math scores in 3rd grade children. Increased blood lead concentrations correlated with a 32% increase in the risk of failing reading and math.

> The cognitive effects of early childhood lead exposure appear to be permanent. In one study, adults who previously had lead-associated developmental delays continued to show persisting cognitive deficits, demonstrating the long-lasting damage of lead exposure.

(Footnotes and citations omitted).

63. Specifically, with regard to lead in Beech-Nut's products, the House Report states:

> Beech-Nut used ingredients containing as much as 886.9 ppb [parts per billion] lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.

64. For example, Beech-Nut used cinnamon that contained 886.9 ppb lead.

65. According to the House Report, Beech-Nut tested and used 57 ingredients that contained over 20 ppb lead, the EU's lax standard for lead in infant formula. Beech-Nut accepted

16

89 ingredients that tested at or over 15 ppb lead, EPA's action level for drinking water, and 483 ingredients that tested at or over 5 ppb lead, FDA's standard for lead in bottled water.

66.     With regard to lead in Gerber's products, the House Report states that Gerber "sold products or used ingredients with significant amounts of lead."

67.     More specifically, the House Report revealed:

> Gerber produced limited lead testing results. The results for its sweet potatoes and juices demonstrated its willingness to use ingredients that contained dangerous lead levels. Gerber used an ingredient, conventional sweet potatoes, with 48 ppb lead. Gerber also used twelve other batches of sweet potato that tested over 20 ppb for lead, the EU's lenient upper standard.

68.     According to the House Report:

> The average amount of lead in Gerber's tested juice concentrates was 11.2 ppb—more than FDA's limit for lead in bottled water. Over 83% of the juice concentrates tested showed greater than 1 ppb lead, which is Consumer Reports' recommended limit for fruit juices.

69.     While no amount of lead is safe in foods for babies and toddlers, the ingredients Defendants used for their products exceeded lead limits provided in other contexts. For example, Healthy Babies Bright Futures has set a target of 0 measurable lead in baby products, Consumer Reports set a limit of 1 ppb lead in food and drink for babies, the WHO set a limit of 10 ppb lead in drinking water, the EPA set a limit of 15 ppb lead in drinking water, the EU set a limit of 20 ppb lead in formula (which the House Report notes is "lax"), the FDA set a limit of 50 ppb lead in juice, and the FDA set a limit of 100 ppb lead in candy.

**E. Defendants' products contain arsenic.**

70.     Regarding inorganic arsenic, the House Report stated, in part:

> Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry

17

(ATSDR). The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."

Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children." This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."

A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold.

Likewise, a study of children in Spain found that increasing arsenic exposure led to a decrease in the children's global motor, gross motor, and fine motor function scores. Boys in particular were more susceptible to arsenic's neurotoxicity.

(Footnotes and citations omitted).

71. The House Report revealed that Beech-Nut's products are contaminated with arsenic, stating:

Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

72. According to the House Report, Beech-Nut used ingredients containing as much as 913.4 ppb arsenic, routinely used ingredients containing over 300 ppb arsenic, and used at least 45 ingredients containing over 100 ppb arsenic.

73. Despite Beech-Nut's claims of real, simple, and all-natural ingredients, the six Beech-Nut ingredients with the highest arsenic levels are all enzyme additives.

74. The House Report revealed that Gerber's products are also contaminated with

arsenic, stating:

> Gerber did not provide inorganic arsenic results for all of its
> ingredients. However, test results for conventional rice flour
> revealed that Gerber routinely used flour with over 90 ppb
> inorganic arsenic.48 Gerber used five batches of rice flour that had
> 98 ppb inorganic arsenic, and 67 batches that contained more than
> 90 ppb.

75.     Despite limitations of 10 ppb in apple juice, Gerber uses grape juice concentrate

registering at 39 ppb inorganic arsenic. The House Report stated:

> But because it was grape juice, as opposed to apple juice—which,
> from a safety perspective, is a distinction without a difference—
> Gerber incorporated in its products juice concentrate with high
> arsenic levels.

76.     While no amount of arsenic is safe in foods for babies and toddlers, the

ingredients Defendants used for their products exceed arsenic limitations provided in other

contexts. For example, the FDA sets a limit of 10 ppb inorganic arsenic in water.

### F. Defendants' products contain cadmium.

77.     Regarding cadmium, the House Report stated, in part:

> Cadmium is number seven on ATSDR's list of substances present
> in the environment that pose the most significant potential threat to
> human health. Cadmium is associated with decreases in IQ, as well
> as the development of ADHD.
>
> A 2018 study found that cadmium exposure negatively affected
> children's Full Scale IQ, particularly among boys. Boys exhibiting
> higher amounts of cadmium exposure had seven fewer IQ points
> than those exhibiting less cadmium exposure. A 2015 study
> similarly found a significant inverse relationship between early
> cadmium exposure and IQ.
>
> A 2018 study linked cadmium exposure to ADHD, finding that the
> disorder was more common among children with the highest levels
> of cadmium exposure as compared to a control group.

(Footnotes and citations omitted).

78.     With regard to Beech-Nut products contaminated with cadmium, the House

Report stated:

> Beech-Nut used 105 ingredients that tested over 20 ppb cadmium.
> Some tested much higher, up to 344.55 ppb cadmium.

79.     According to the House Report, Beech-Nut used 20 ingredients registering over

100 ppb cadmium, including cinnamon containing 344.5 ppb cadmium. That is more than 17

times higher than the EU's lax upper limit on cadmium in baby food. At least 105 ingredients

that Beech-Nut tested and used in baby foods registered at or over 20 ppb cadmium—the EU's

lax infant formula upper limit.

80.     Beech-Nut accepted certain ingredients for its baby foods despite knowing that

they contained over 20% more cadmium than their already-high internal limit.

81.     With regard to Gerber, the House Report noted:

> Gerber does not test all its ingredients for cadmium. Of those it
> does test, it accepts ingredients with high levels of cadmium.
> Gerber used multiple batches of carrots containing as much as 87
> ppb cadmium, and 75% of the carrots Gerber used had more than 5
> ppb cadmium— the EPA's drinking water standard.

82.     While no amount of cadmium is safe in the baby foods offered to infants and

toddlers, Defendants used ingredients that well exceeded cadmium limits in other contexts, e.g.,

Consumer Reports sets a limit of 1 ppb in juice, WHO sets a limit of 3 ppb in water, the FDA

and EPA set limits of 5 ppb in water, and the EU sets a limit of 5-20 ppb in formula, which the

House Report notes is "lax."

### G. Beech-Nut fails to test its products or its product ingredients for mercury and Gerber "barely" does so.

83.     Concerning mercury, the House Report stated, in part:

> Mercury is number three on ATSDR's list of substances present in
> the environment that pose the most significant potential threat to
> human health. Studies of mercury's effect on childhood
> development have primarily been conducted by considering the
> mother's exposure to mercury while pregnant. In these instances,

20

"pre-natal mercury exposure has been consistently associated with adverse subsequent neuro-development. And pre-natal mercury exposure is also related to poorer estimated IQ. Beyond prenatal exposure, higher blood mercury levels at "2 and 3 years of age were positively associated with autistic behaviors among preschool-age children."

(Footnotes and citations omitted).

84.     The House Report notes that Beech-Nut "do[es] not even test for mercury in baby food."

85.     The House Report notes that Gerber "barely tests" for mercury, stating:

Gerber only tests certain ingredients for mercury. Of the test results they presented to the Subcommittee, they only tested carrots, sweet potatoes, and lemon juice concentrate.

86.     Healthy Babies Bright Futures recommends that no detectible mercury be permitted in baby food, and the EPA sets a limit of 2 ppb in water.

### H. Beech-Nut sets unsafe internal thresholds for dangerous elements and sells products even when their ingredients exceed those internal thresholds.

87.     Beech-Nut set internal standards for arsenic and cadmium at 3,000 ppb in its additives—like vitamin mix—and 5,000 ppb lead in certain ingredients—like BAN 800, an additive that reportedly "increases crumb softness" in baked goods. House Report at 4, 18.

88.     These standards were the *highest* (i.e., they allowed for the *most* harmful contaminants) of any of the baby food manufacturers who responded to the Subcommittee's inquiries. House Report at 4, 37-38.

89.     The standards Beech-Nut set "far surpass any existing regulatory standard in existence and toxic heavy metal levels for any other baby food manufacturer that responded to the Subcommittee's inquiry." House Report at 38.

90.     While Beech-Nut set internal thresholds for certain contaminants, like arsenic, it

did so only for *ingredients*, and did not test its final product. House Report at 17.

91.     What's more: Beech-Nut exceeded its already egregiously high internal safety

thresholds. According to the House Report:

> Beech-Nut sold eleven products that surpassed its own internal
> cadmium limits. By doing so, Beech-Nut accepted dehydrated
> potato containing 119.6, 143.5, and 148.4 ppb cadmium, far
> surpassing its own internal limit of 90 ppb for that ingredient.

House Report at 38.

92.     Despite these findings, Beech-Nut continues to reassure parents that its products

are highly tested and safe with a "Food Quality & Safety" page on its website which reads, in

part:



**We start by carefully choosing high quality fruits and vegetables…**

We take our responsibility very seriously to find the purest, cleanest fruits and
vegetables out there, while adhering to rigorous quality standards.

However, we know that there are a lot of contaminants out there in the environment. They are in the soil, the water, the air—and even found in trace amounts in the fruits and vegetables you buy at the store or farmer's market.

We've been testing our ingredients for contaminants such as heavy metals and pesticides since 1985, and we're aware of no higher standards in the industry than ours. Beech-Nut prides itself on its partnerships with farmers to help ensure that they understand, and can meet, the level of quality we require. We continuously improve our food safety and quality standards based on the most up to date scientific technology. We also seek guidance from sources such as the Food and Drug Administration (FDA), Environmental Protection Agency (EPA), the European Food Safety Authority (EFSA) and the World Health Organization (WHO).

## Going above and beyond the "standard": Baby Food Council Partnership

The EPA, U.S. Department of Agriculture (USDA) and other government bodies have baseline standards for limits on pesticides and organic certification. Yet, our pesticide standards are the same or stricter than government requirements.

Additionally, Beech-Nut is a founding member of the Baby Food Council which includes government agencies, industry experts, advocacy groups, Cornell University and major baby food companies. The American Academy of Pediatrics (AAP) is a technical advisor to the Council.  The Baby Food Council was created in January 2019 in order to create science-based standards for reducing levels of heavy metals in food products to as low as reasonably achievable, using best-in-class management techniques.

As industry leaders, we understand that creating standards specific to baby food is the best way to lead the food industry and continuously make baby food that is safe.  That's why, as part of the Baby Food Council, we have been partnering with key stakeholders, including the FDA, to create Baby Food Standards for contaminants management across the entire industry.

We are committed to delivering these high standards and here's how we do it:

## Beech-Nut's high standards

| more than **30** years of testing for lead and heavy metals | we test for up to **255** pesticides, toxins and heavy metals, including lead | we conduct more than **20** rigorous tests on our delicious purées | our lab analysts have over **140** years of combined food testing experience |
| --- | --- | --- | --- |

# The health and safety of your baby is at the heart of what we do

We know moms, dads and caregivers depend on our commitment to help keep their children healthy and thriving.  As a company of parents who are proud to feed our own children Beech-Nut, we take the responsibility to provide safe, nutritious food as our highest purpose for over 130 years.

Since we know you don't have an *Inductively Coupled Plasma–Mass Spectrometer* or a *Gas Chromatograph* to conduct these food quality tests in your own kitchen, we conduct more than 20 rigorous tests on our delicious purées alone to ensure that the safety, quality and flavors are just right. That way, when our foods reach your little one's highchair, you can feel confident you're giving your baby the best.

93.     According to web.archive.org, this page (or one substantially similar) has appeared on Beech-Nut's website since at least October 2017. And it continues to appear as of the date of this complaint's filing, despite the House Report's exposé of Beech-Nut's dangerous practices and products.

## I.     Defendants reassure parents about the safety of their products despite recklessly failing to test them.

94.     In addition to their knowing and reckless use of ingredients containing harmful contaminates, Defendants' policy of testing ingredients, and not final products, "recklessly

24

endangers babies and children and prevents the companies from even knowing the full extent of the danger presented by their products," according to the House Report.

95.     Defendants have profited (and continue to profit) from their false and misleading marketing and sales of dangerous products, targeted at the most vulnerable members of our population—infants. And instead of revealing the risks associated with their products, even after testing has revealed their baby foods contain dangerous contaminants, Defendants continue to misleadingly reassure parents and falsely claim that their products are safe and rigorously tested.

## V.     CLASS ALLEGATIONS.

96.     Plaintiff seeks certification of the class set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiff seeks class certification of all claims for relief herein on behalf of a **Nationwide Class** defined as follows:

> All persons who reside in the United States and who purchased and/or fed their child Beech-Nut and/or Gerber baby or toddler food products.

97.     In the alternative, Plaintiff seeks class certification of all claims for relief herein on behalf of a **Multi-State Consumer Protection Class** defined as follows:

> All persons who reside in Louisiana or any state with materially similar consumer protection laws[22] who purchased and/or fed their

---

[22] While discovery may alter the following, Plaintiff asserts that the states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code § 4-88-101, et seq.); California (Cal. Bus. & Prof. Code §§ 17200 and 17500 et seq.); Colorado (Colo. Rev. Stat. § 6-1-101, et seq.); Connecticut (Conn. Gen. Stat. § 42-110, et seq.); Delaware (Del. Code tit. 6, § 2511, et seq.); District of Columbia (D.C. Code § 28-3901, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Hawaii (Haw. Rev. Stat. § 480-1, et seq.); Idaho (Idaho Code § 48-601, et seq.); Illinois (815 Ill. Comp. Stat. § 505/1, et seq.); Louisiana (La. Rev. Stat. 51:1401, et seq.); Maine (Me. Rev. Stat. tit. 5, § 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Montana (Mont. Code. § 30-14-101, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); Nevada (Nev. Rev. Stat. § 598.0915, et seq,); New Hampshire (N.H. Rev. Stat. § 358-A:1, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New Mexico (N.M. Stat. § 57-12-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); North Dakota (N.D. Cent. Code § 51-15-01, et seq.); Oklahoma (Okla. Stat. tit. 15, § 751, et seq.);

child Beech-Nut and/or Gerber baby or toddler food products.

98.     Plaintiff is the proposed class representative for the Nationwide Class and the Multi-State Consumer Protection Class.

99.     Plaintiff reserves the right to modify or refine the definitions of the Class.

100.    Excluded from the Class are: **(i)** any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; **(ii)** Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; **(iii)** persons who properly execute and file a timely request for exclusion from the class; **(iv)** persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; **(v)** counsel for Defendants; and **(vi)** the legal representatives, successors, and assigns of any such excluded persons.

101.    **Ascertainability**. The proposed Class is readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they are part of the Class. Further, the Class can be readily identified through records maintained by Defendants.

102.    **Numerosity (Rule 23(a)(1))**. The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members, as herein identified and described, is not known, but Defendants are each estimated to have millions of customers.

103.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members,

---

Oregon (Or. Rev. Stat. § 646.605, et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.); South Dakota (S.D. Codified Laws § 37-24-1, et seq.); Texas (Tex. Bus. & Com. Code § 17.41, et seq.); Virginia (VA Code § 59.1-196, et seq.); Vermont (Vt. Stat. tit. 9, § 2451, et seq.); Washington (Wash. Rev. Code § 19.86.010, et seq.); West Virginia (W. Va. Code § 46A-6- 101, et seq.); and Wisconsin (Wis. Stat. § 100.18, et seq.).

including the following:

     a)     Whether Defendants engaged in the activities and practices referenced above;

     b)     Whether Defendants' activities and practices referenced were unlawful;

     c)     Whether Plaintiff and members of the Class sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

     d)     Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount; and

     e)     What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully sell dangerous baby food products and/or make false and misleading claims regarding the health and safety of their products.

104.    **Typicality (Rule 23(a)(3))**. Plaintiff's claims are typical of the claims of members of the Class because, among other things, Plaintiff and members of the Class sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

105.    **Adequacy (Rule 23(a)(4))**. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class and Plaintiff has retained counsel experienced in complex class action to prosecute this case on behalf of the Class.

106.    **Predominance & Superiority (Rule 23(b)(3))**. In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation

and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

107. **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class, making final declaratory and/or injunctive relief appropriate with respect to the Class as a whole.

108. **Particular Issues (Rule 23(c)(4))**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Her claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

<u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION**
**Violation of New York Gen. Bus. Law § 349**
**(On Behalf of the Plaintiff and the Class)**

109. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

110. New York General Business Law Section 349 ("Gen. Bus. Law § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

111. The conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of Gen. Bus. Law § 349, and as such, Plaintiff and the Class seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting their products.

112. There is no adequate remedy at law.

113. Defendants misleadingly, inaccurately, and deceptively marketed their products to consumers.

114. Defendants' improper consumer-oriented conduct—including labeling and advertising their products as safe and natural—is misleading in a material way in that they, *inter alia*, induced Plaintiff and Class to purchase and to pay a premium for their products and to use the products when they would not have otherwise done so.

115. Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

116. Plaintiff and the Class have been injured inasmuch as they purchased, paid a premium for, and/or fed their children products that were—contrary to Defendants' representations—unsafe.

117. Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

118. Defendants' advertising and products' packaging and labeling induced the Plaintiff and Class to buy Defendants' products and to pay a premium price for them.

119. Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class have been damaged thereby.

120.     As a result of Defendants' recurring, "unlawful" deceptive acts and practices,

Plaintiff and Class are entitled to monetary, compensatory, treble and punitive damages,

injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendants'

unlawful conduct, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**Violation of New York Gen. Bus. Law § 350**
**(On Behalf of the Plaintiff and the Class)**

121.     Plaintiff repeats and incorporate by reference all preceding paragraphs as if fully

set forth herein.

122.     N.Y. Gen. Bus. Law § 350 provides, in part, that "False advertising in the conduct

of any business, trade or commerce or in the furnishing of any service in this state is hereby

declared unlawful."

123.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling,
> of a commodity, or of the kind, character, terms or conditions of
> any employment opportunity if such advertising is misleading in a
> material respect. In determining whether any advertising is
> misleading, there shall be taken into account (among other things)
> not only representations made by statement, word, design, device,
> sound or any combination thereof, but also the extent to which the
> advertising fails to reveal facts material in the light of such
> representations with respect to the commodity or employment to
> which the advertising relates under the conditions proscribed in
> said advertisement, or under such conditions as are customary or
> usual. . .

124.     Defendants' labeling and advertisements contain untrue and materially misleading

statements and omissions regarding the safety of their products.

125.     Plaintiff and the Class have been injured inasmuch as they relied upon the

labeling, packaging, and advertising in purchasing the products, in payment of a premium for

them, and/or in feeding them to their children when the products were—contrary to Defendants'

representations—not safe.

126. Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

127. Defendants' advertising, packaging, and products' labeling induced the Plaintiff and Class to buy Defendants' products.

128. Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

129. Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

130. Defendants made the material misrepresentations described in this Complaint in Defendants' advertising, and on the products' packaging and labeling.

131. Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the products and/or feeding them to their children were and continue to be exposed to Defendants' material misrepresentations and omissions.

132. As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and Class are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation
### (On Behalf of the Plaintiff and the Class)

133. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

134. Defendants, directly, or through their agents and employees, made false

representations, concealments, and non-disclosures to Plaintiff and Class members about their products' safety and testing.

135.     In making these false, misleading, and deceptive representations and omissions, Defendants knew and intended that consumers would purchase their products, would pay a premium for their products, and would feed their products to their children.

136.     Defendants created a special relationship with Plaintiff and the Class through their representations regarding their products' safety and regarding the companies' rigorous, scientific testing and research.

137.     As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive statements, representations, and omissions, Defendants injured Plaintiff and Class Members in that they purchased, they paid a premium price for, and they fed their children the products, which were not as represented.

138.     In making the misrepresentations of fact and omissions to Plaintiff and Class Members as described herein, Defendants have failed to fulfill their duties to disclose material facts about their products.

139.     The failure to disclose the true nature of the products' safety, testing, and compliance with internal safety thresholds was caused by Defendants' negligence and carelessness.

140.     Defendants, in making these misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the misrepresentations were not true. Defendants made and intended the misrepresentations to induce the reliance of Plaintiff and Class Members.

## FOURTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
#### (On Behalf of the Plaintiff and the Class)

141.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

142.    Under the Uniform Commercial Code's implied warranty of merchantability, the Defendants warranted to Plaintiff and Class members that the products were safe, natural, and rigorously tested.

143.    Defendants breached the implied warranty of merchantability in that Defendants' products' ingredients are unsafe, and reasonable consumers expecting products that conform to their labels and the company's safety representations would not accept the Defendants' products if they knew that they actually contained harmful toxins.

144.    Within a reasonable amount of time after the Plaintiff discovered that the products were unsafe, Defendants were placed on notice of such breach, including via the House Report and other cases filed against Defendants.

145.    The inability of the Defendants' products to meet the label description was wholly due to the Defendants' fault and without Plaintiff's or Class Members' fault or neglect, and was solely due to the Defendants' manufacture and distribution of the products to the public.

146.    As a result of the foregoing, Plaintiff and Class Members have been damaged in the amount paid for the Defendants' products, together with interest thereon from the date of purchase.

## FIFTH CAUSE OF ACTION
### Breach of Implied Warranty of Fitness for a Particular Purpose
#### (On Behalf of the Plaintiff and the Class)

147.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

148. Defendants knew or had reason to know that the Plaintiff and other Class Members were buying their products with the specific purpose of buying products that were safe and rigorously tested.

149. Plaintiff and the other Class Members, intending to use safe products, relied on the Defendants in selecting their products to fit their specific intended use.

150. Defendants held themselves out as having particular knowledge of their products' ingredients and safety.

151. Plaintiff's and Class Members' reliance on Defendants in selecting Defendants' products to fit their particular purpose was reasonable given Defendants' claims and representations in their advertising, packaging, and labeling concerning the products' ingredients, safety, and testing.

152. Plaintiff and the other Class Members' reliance on Defendants in selecting Defendants' products to fit their particular use was reasonable given Defendants' particular knowledge of the products they manufacture and distribute and their purported research, tracking, and testing of those products.

153. As a result of the foregoing, Plaintiff and Class Members have been damaged in the amount paid for the Defendants' products, together with interest thereon from the date of purchase.

**SIXTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(On Behalf of the Plaintiff and the Class)**

154. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

155. Defendants provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the products are natural,

34

safe, and rigorously researched and tested.

156.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

157.     These affirmations of fact became part of the basis for the bargain and were material to the Plaintiff's and Class Members' transactions.

158.     Plaintiff and Class Members reasonably relied upon the Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' products.

159.     Within a reasonable time after Plaintiff knew or should have known of Defendants' breach, Defendants were placed on notice of their breach, including through the House Report and other lawsuits filed against Defendants, had an opportunity to cure their breach, and they have not done so.

160.     Defendants breached the express warranty because the products are neither safe nor rigorously tested (or, if they are rigorously tested, that testing revealed the products were unsafe and should not be sold).

161.     Defendants thereby breached the state warranty laws of the following states and of other states with similar warranty laws: Code of Ala. § 7-2-313; Alaska Stat. § 45.02.313; A.R.S. § 47-2313; A.C.A. § 4-2-313; Cal. Comm. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; 6 Del. C. § 2-313; D.C. Code § 28:2-313; Fla. Stat. § 672.313; O.C.G.A. § 11-2-313; H.R.S. § 490:2-313; Idaho Code § 28-2-313; 810 I.L.C.S. 5/2-313; Ind. Code § 26-1-2-313; Iowa Code § 554.2313; K.S.A. § 84-2-313; K.R.S. § 355.2-313; 11 M.R.S. § 2-313; Md. Code Ann., Com. Law § 2-313; 106 Mass. Gen. Laws Ann. § 2-313; M.C.L.S. § 440.2313; Minn. Stat. § 336.2-313; Miss. Code Ann. § 75-2-313; R.S. Mo. § 400.2-313; Mont.

Code Ann. § 30-2-313; Neb. Rev. Stat. § 2-313; Nev. Rev. Stat. Ann. § 104.2313; R.S.A. 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; Ohio Rev. Code Ann. § 1302.26; Okla. St. § 12A-2-313; Or. Rev. Stat. § 72-3130; 13 Pa. Stat. § 72-3130; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Codified Laws, § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code § 2.313; Utah Code Ann. § 70A-2-313; 9A Vt. Stat. Ann. § 2-313; Va. Code Ann. § 59.1-504.2; Wash. Rev. Code Ann. § 6A.2-313; W. Va. Code § 46-2-313; Wis. Stat. § 402.313; and Wyo. Stat. § 34.1-2-313.

162.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the products, in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class)**

163.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

164.    Plaintiff and the Class have conferred substantial benefits on Defendants by purchasing their baby food products.

165.    Defendants have knowingly and willingly accepted and enjoyed these benefits.

166.    Defendants either knew or should have known that the benefits rendered by the Plaintiff and the Class were given with the expectation that Defendants' products were safe.

167.    For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

168.    Through deliberately misleading Plaintiff and the Class, Defendants reaped benefits that resulted in Defendants wrongfully receiving profits.

169.     Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Class.

170.     As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiff and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

**EIGHTH CAUSE OF ACTION**
**Violation of the State Consumer Protection Statutes**
**(On Behalf of Plaintiff and the Multi-State Consumer Protection Class)**

171.     Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1 through 108 as if fully set forth herein.

172.     In the alternative to a nationwide class, Plaintiff brings this action individually and on behalf of the Multi-State Consumer Protection Class.

173.     Plaintiff and Class members have been injured as a result of Defendants' violations of the state consumer protection statutes listed and substantially similar to those listed above in footnote 22 which also provide a basis for redress to Plaintiff and Class members based on Defendants' fraudulent, deceptive, unfair, and unconscionable acts, practices and conduct.

174.     Defendants' conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

175.     Defendants committed unfair and deceptive acts by misrepresenting that their products were safe and rigorously tested and by failing to disclose that their products and product ingredients contained harmful contaminants.

176.     Defendants violated the Multi-State Consumer Protection Class states' unfair and

deceptive acts and practices laws by engaging in these unfair or deceptive acts or practices.

177.     Plaintiff and the Multi-State Consumer Protection Class were injured and have suffered damages as a direct and proximate result of Defendants' unfair acts and practices.

178.     Plaintiff and the other Multi-State Consumer Protection Class Members' injuries were proximately caused by Defendants' unfair and deceptive business practices.

179.     As a result of Defendants' violations, Defendants have been unjustly enriched.

180.     Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Class members are entitled to recover compensatory damages, restitution, punitive and special damages including, but not limited to, treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## VI.     PRAYER FOR RELIEF & DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiff respectfully demands a jury trial and requests that this Court certify the Class, award Plaintiff and the Class compensatory and punitive damages, injunctive relief, and attorneys' fees, and grant such other and further relief as this Court deems appropriate.

Dated: March 11, 2021                          **FEGAN SCOTT LLC**

By: /s/ Melissa Ryan Clark
Melissa Ryan Clark
140 Broadway, 46th Floor
New York, New York 10005
Ph: 347.353.1150
melissa@feganscott.com

Elizabeth A. Fegan (*pro hac vice forthcoming*)
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

*Counsel for Plaintiff*